**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No. 1:24-cv-24700-RNS

| | |
|---|---|
| RONIN FACTORY, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| IMPORT GLOBAL, LLC, | ) |
| ABRAHAM HABOSHA, and | ) |
| LINDSAY MILLER, | ) |
| | ) |
| Defendants. | ) |

**<u>DEFENDANTS' OPPOSITION TO PLAINTIFF'S</u>**
**<u>MOTION FOR PERMANENT INJUNCTION</u>**

## I.    INTRODUCTION

This case represents a calculated attempt to destroy a competitor and try to monopolize the aftermarket bullet antenna industry through misuse of intellectual property law. Plaintiff Ronin Factory LLC ("Ronin") seeks extraordinary injunctive relief based on legally insufficient claims to trade dress rights that have already been rejected in this industry. Indeed, just four years ago, the Trademark Trial and Appeal Board canceled another company's registration for a bullet antenna design, finding no acquired distinctiveness despite nine years of use. Yet Plaintiff now claims these same rights after fewer years in a crowded market where dozens of companies sell virtually identical products on the same online marketplaces.

Plaintiff's motion rests entirely on the conclusory declarations of its owner, who attempts to claim trade dress protection for everything from the inherently functional shape of a bullet to the standardized layout of Amazon's marketplace. More troublingly, Plaintiff supports its motion with misattributed evidence, including an instruction sheet falsely labeled as Defendant's. This is not a case about protecting legitimate intellectual property rights - it is an attempt to eliminate fair competition through litigation. The Court should deny the extraordinary remedy of preliminary injunction which devastate this small business.

## II.    FACTUAL BACKGROUND

### A.  Import Global's Business

Import Global, LLC ("Import Global") is a small Florida company that began operations in 2018, with a focus on selling products online. Ex. 1.  It distributes products through its own websites as well as established e-commerce platforms, including Amazon.com, eBay.com, and Walmart.com. *Id.* Import Global markets various product lines under several registered and unregistered trademarks. In August 2018, Import Global launched a line of aftermarket automotive parts designed to enhance the aesthetic and functional aspects of automobiles and in particular

trucks. *Id.* These products—ranging from truck bed extenders and storage boxes to cargo racks, hub cap covers, and license plate frames—are marketed under the EcoAuto trademark. *Id.* After Import Global filed an application for registration, the EcoAuto trademark was registered on the principal register on May 28, 2019. Ex. 2. The registration remains active on the principal register and Import Global continues to sell products under this trademark.

Like many small companies operating exclusively online, Import Global continuously evaluates the marketplace in search of products which it believes its customers may want and which may align with its current market focus. In 2022, Import Global expanded its product line to include aftermarket truck short stubby antennas including those shaped like recognizable ammunition calibers, such as the .50-caliber bullet. Ex. 1. These antennas were designed to fit all major truck brands and feature a wide variety of unique printed designs and cater to consumers seeking a rugged, military-inspired aesthetic for a truck. Import Global focused on customers who want to enhance the look and utility of their vehicles by replacing stock parts with aftermarket parts that match the look they want with different designs and colors to choose from. *Id.*

The stubby and ammo antenna market that Import Global entered in 2022 was already active with companies which had been selling similar antennas as early as 2010. *Id.* Import Global expanded its offering of antennas by offering more colors and designs that it believed would cater to its existing customers and potential new customers both on its website and online marketplaces such as Amazon.com. Ex. 3. By December 16, 2022, Import Global had created the "badass bullet antenna" trademark and began using it on its packaging for its bullet antennas. On January 17, 2023, Import Global filed an application with the USPTO to register the trademark and on the March 12, 2024, the USPTO issued the registration. Ex. 4. Similarly, Import Global created and used its EasyLock trademark which was granted trademark registration on October 29, 2024. Ex.

3

5. Import Global also created a fanciful design trademark which was applied to the product and packaging to round out its marketing campaign. Ex. 6.

After launching its antenna product line, Import Global has invested approximately Two Million Dollars ($2,000,000) in marketing and had generated approximately Four Million Dollars in annual sales. Ex. 1.  Import Global recognized that several other providers limited their product lines to basic matte black designs, so it focused on providing a greater variety of colors and designs. *Id*.  Import Global attributes its success to offering customers better value with more options to choose from.

### B.  Aftermarket Antenna Business

When Import Global entered the stubby antenna and ammo antenna market in 2022, many other companies were already selling similar antennas.  ESR Performance Corp., operating as VMS Racing, had previously labeled its product as the "The Original Bullet Antenna" because it claims to have been selling bullet antennas since 2010.  One of its amazon.com listings for a black bullet antenna with its logo located at the base of the bullet indicates that it was first available on Amazon on April 9, 2015.  Ex. 7.

On April 23, 2015, ESR Performance filed a trademark application with the USPTO seeking to register a mark comprising the design of a bullet cartridge for automobile antennas.  Ex. 8.  In the application, ESR Performance claimed that it first used this bullet cartridge design in commerce on November 3, 2010.  The USPTO granted the application and registered the bullet cartridge design as a trademark for ESR Performance on May 10, 2016.  Ex. 8.  The ESR design is almost identical to the Ronin design and alleged trade dress.  On August 24, 2020, the ESR bullet design trademark registration was canceled by the USPTO.

The 2020 cancellation of the ESR bullet design trademark was the result of a cancellation proceeding filed by JVMAX, another competitor in the bullet antenna market.  After a trial, the

USPTO's Trademark Trial and Appeal Board agreed with JVMAX and granted its cancellation petition. *JVMAX, Inc. v. ESR Performance Corp.* No. 92063873 (TTAB June 29, 2018)[non-precedential]; attached as Ex. 9.  The Board found that although ESR Performance had sold the bullet design antenna for nine years, that use was not "necessarily conclusive or persuasive considering that its mark is a product configuration". *Id* at 30.  The Board granted the petition and cancelled the registration on the "ground that the purported mark has not acquired distinctiveness" which was a necessary component of trademarks and in particular trade dress.

Another early seller of bullet antennas is a company called Metra Electronics Corporation, located in Holly Hill, Florida.  In 2014, Metra Electronics created the name "AMMOTENNA" and received a trademark registration for it on July 7, 2015, claiming a first use in commerce of November 3, 2014.  Ex. 10.  Like ESR, AmmoTenna sells automotive antennas that are shaped like popular ammunition calibers including 30-cal, 50-cal, and 7.62-cal antennas.  See Ex. 11 for excerpts from AmmoTenna's catalog.

Soon after entering the market, Metra Electronics began producing and posting YouTube videos about its AmmoTenna branded ammo style antennas.  On April 15, 2016, Metra Electronics posted a video titled AMMOTENNA with a description that states: "New line of AmmoTenna Automotive Antenna Replacement Masts! .50cal, .30cal, 7.62mm and Arrow styles. Each AmmoTenna mast is made from 6061 billet aluminum. Multiple adapters are included to fit most applications including the new Jeep 5/16th thread."  See Ex. 12 for screenshots from the video.

These are just two examples of companies who were selling bullet antennas prior to Ronin's entry into the market and who continue to sell bullet antennas.  There are many more companies who have been selling bullet antennas and continue to sell bullet antennas.  A review of Amazon.com reveals that there are approximately 70 unique sellers of bullet antennas on

amazon.com who cumulatively offer approximately 296 unique products of similarly styled bullet antennas and whose product imaging and marketing are all similar.  Ex. 1; Ex. 13.  Each of these vendors uses images of their products along with images of the products being installed on trucks. This is a standard practice for marketing truck accessories such as antennas.  Ex. 14.

### C.  Ronin's Allegations

Ronin alleges three categories of intellectual property violations stemming from Import Global's sale of its EcoAuto antennas.  First, Ronin claims trademark infringement of U.S. Registration No. 6,399,834, which Ronin describes as a "chevron style" design and alleges it began using 2018. Second, Ronin asserts one are more trade dress claims which are undefined or at best ambiguous but allegedly cover not only the bullet design of the antenna product but virtually every aspect of Ronin's business presentation—from product design to packaging to the layout of its Amazon and other online marketplace listings. Third, Ronin alleges copyright infringement of a single product photograph under Registration No. VA-2-395-784.

Ronin's motion relies entirely on the self-serving, speculative, and conclusory statements of its sole owner.  Ronin's motion also relies on statements and images being falsely attributed to Import Global.  To address this, Import Global has filed a motion to strike.  Ronin does not present any competent evidence to establish that any of its asserted trade dress has acquired distinctiveness to associate the trade dress with Ronin. Neither does Ronin present competent evidence demonstrating secondary meaning in its claimed trade dress, any competent evidence of actual confusion of any of its alleged marks, or any showing that its alleged harm cannot be adequately compensated through monetary damages. Instead, Ronin seeks extraordinarily broad injunctive relief that would effectively bar Import Global from using industry-standard practices in offering automotive accessories through e-commerce and devastate this small Florida company.

### III.    A PRELIMINARY INJUNCTION IS AN EXTRAORDINARY REMEDY

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id*. at 20. "Because a preliminary injunction is a drastic remedy, the plaintiff bears the burden to clearly establish each of the four elements." *USA Nutraceuticals Group v. BPI Sports*, 165 F. Supp. 3d 1256, 1262 (S.D. Fla. 2016). Ronin has failed to establish any of the four required elements.

### IV.    RONIN CANNOT PREVAIL ON ITS TRADE DRESS CLAIMS

#### A.  Ronin has failed to articulate what it considers its trade dress

Any analysis of Ronin's alleged trade dress must begin with a clear description and understanding of what exactly Ronin is claiming as its trade dress.  Ronin failed in this initial task. In its motion, Ronin claims that it has trade dress rights in 1) "its product design"; 2) "its packaging"; and 3) "its style of doing business which includes the product design, packaging, and online marketplace layout and presentation, among other things".  No description of the "among other things" is provided but even that would not have clarified what Ronin alleges its trade dress to be.  In enumerating its "trade dress rights", Ronin uses the conjunction "and" in its listing of the (4) trade dress elements. Ronin fails to articulate whether each category is considered a separate trade dress or whether it considers the combination of selling a bullet antenna on an online website and packaging it in a black tubular package with white letters as its protectible trade dress. Moreover, Ronin's reference to its "style of doing business" is ambiguous and disconnected from the actual product and includes the online marketplace such Amazon's website.

Mr. Macco asserts that the trade dress in the product design includes not only the shape but also the color and branding of its antennas.  Mr. Macco's declaration includes images alleged to show examples of this alleged trade dress.  Each of the antennas are black in color, include Ronin's logo, and are shown on a page in which the Ronin name is clearly displayed.  Moreover, the description of the product in Ronin's example of its trade dress does not refer to Ronin but instead refers to Ford, a well-known truck manufacturer.   For example, the predominate image in Mr. Macco's declaration describes the product as "FORD TUFFLOCK BULLET ANTENNA" giving the clear impression that this product is more of a Ford product rather than a Ronin product.

Ronin's allegations regarding its product packaging trade dress are also ambiguous and incomplete.  Ronin submits a declaration from Scott Macco, its owner, purporting to describe the packaging trade dress in paragraph 10.  However, that paragraph is incomplete, and the subsequent paragraph 11 is missing.  Ronin fails to fully describe and define with competent evidence its alleged packaging trade dress.

It is well established that the term "'trade dress' refers to <u>the appearance of a product</u> when that appearance is used to identify the producer" of that product. (emphasis added) *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1322 (11th Cir. 2012).  Trade dress is the "complex composite of features of a product" which must be considered together not separately.  *Id.*  Any analysis of Ronin's trade dress rights must not only include the product design shape and black color but also the use of Ronin's logo and the composite of features that Mr. Macco defined as the product design trade dress.  Although Import Global may sell a similarly shaped bullet antenna, there is no evidence that Import Global uses the Ronin logo or other branding that Mr. Macco testified must be included in Ronin's trade dress.

**B.  Ronin has no trade dress rights in the shape of the bullet antenna**

Ronin must prove that it has valid trade dress rights in the design and appearance of the bullet antenna that it sells.  *Id.*  Ronin has no registration for this alleged trade dress and the USPTO's Trademark Trial and Appeal Board cancelled the registration of ESR Performance bullet antenna design.  Ex. 9.  ESR had been selling its bullet antenna well before Ronin entered the market and for a longer period time than Ronin has been in the market.  To show that it has valid trade dress rights, Ronin must prove that the trade dress is "distinctive".  *Id.*  To do so, Ronin must show that the trade dress is either "inherently distinctive" or has acquired "secondary meaning" in the minds of consumers.  *Id.*  As a matter of law, Ronin cannot meet this burden.

**1.  Ronin's bullet antenna product design cannot be inherently distinctive as a matter of law.**

Trade dress in a product's design cannot be considered inherently distinctive.  *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d at 1323 (citing *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 213-14 (2000)).  Accordingly, the bullet antenna design can be eligible for trade dress protection only on a showing of acquired distinctiveness.  *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. at 213 ("Consumers are aware of the reality that, almost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source, but to render the product itself more useful or more appealing.")

**2.  Ronin's bullet antenna has not acquired secondary meaning**

A mark has acquired distinctiveness "if it has developed secondary meaning, which occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself."  *Id* at 211.  Ronin has not proffered any evidence to support any finding that the shape of a bullet antenna in the minds of the public identifies Ronin as the source of bullet antennas rather than the source of Ronin's product itself.

Ronin relies on general statements regarding the amount of Ronin's general advertising spending, sales revenue, and the length of time that Ronin has been selling bullet antennas. Those general statements do nothing to support a finding of secondary meaning for the product design of the bullet antenna. Mr. Macco's declaration does not distinguish its advertising efforts for the bullet antenna from its other products, including antenna which are not shaped like a bullet. Indeed, the motion comparing packaging and marketing between Ronin and Import Global includes antennas which are not designed and shaped like a bullet. "To be probative of secondary meaning, the advertisement must direct the consumer to those features claimed as trade dress." *Yankee Candle Co. v Bridgewater Candle Co.*, 259 F.3d 25, 44 (1st Cir. 2001); *see also First Brands Corp. v. Fred Meyer, Inc.* 809 F.2d 1378, 1383 (9th Cir. 1987)(rejecting a claim of secondary meaning in the shape and color of an antifreeze container for failure to call out the trade dress in its advertising).

Ronin's own marketing undermines its trade dress claims by emphasizing the generic bullet design rather than any source-identifying features. Its Amazon listing promotes a "50 Cal Bullet Antenna," explicitly connecting the product's appeal to its resemblance to ammunition rather than to Ronin's brand. Consumers purchase these antennas specifically because they want the rugged aesthetic of a bullet-shaped antenna on their trucks—despite potential compromises in reception quality—not because they seek a "Ronin antenna." Ex. 1. Ronin offers no evidence that customers associate the bullet shape with its brand rather than with the ammunition it intentionally mimics.

The Trademark Trial and Appeal Board was faced with the same question when it reviewed the petition to cancel ESR Performance's trademark registration for its bullet antenna. *JVMAX, Inc. v. ESR Performance Corp.* No. 92063873 (TTAB June 29, 2018)[non-precedential]. Ex. 9. The Board in that case reached the same conclusion that Import Global urges here. Notably, ESR

submitted substantially more evidence of its use of the bullet antenna design for a period of nine years, having extensive online sales, and a registered trademark. As here, the Board found that ESR did nothing to notify competitors that it considers the bullet shaped antenna to be a trademark both before and after its registration and that nine years of use might be significant, but it was not conclusive or persuasive considering the mark is a product configuration. *Id* at 30(citing *In re R.M. Smith, Inc.*, 734 F.2d 1482 (Fed. Cir. 1984) (eight years use was not sufficient evidence of acquired distinctiveness for the configuration of pistol grip water nozzle for water nozzles). On August 24, 2020, the United States Patent and Trademark Office accepted the decision of the Board and canceled the ESR's bullet design registration. Ex. 15.

Ronin has failed to present any competent evidence that supports a finding that its bullet antenna design or its trade dress as defined by Mr. Macco has acquired distinctiveness. The bullet antenna market existed when Ronin entered the market in 2018. ESR Performance's registered trademark for the bullet design had issued before Ronin entered the market and remained active for (2) years after Ronin entered the market. During this time numerous other companies entered the market and continue to sell competing bullet design antennas today. Ex. 1. Indeed, Import Global had been selling its bullet antennas for approximately (2) years in competition with Ronin before Ronin filed this lawsuit. Mr. Macco's general self-serving conclusory statements cannot overcome these legal obstacles and elevate Ronin above the crowd of competitors to grant it exclusive rights in the design and configuration of a 50-caliber bullet antenna to the detriment of all other competitors including Import Global.

### C. Ronin has no trade dress rights in the tubular packaging used to ship its cylindrical antennas

Like product design trade dress, product packaging that is dictated by the nature of the product itself cannot be inherently distinctive. *Paddington Corp. v. Attiki Importers & Distributors*,

Inc., 996 F.2d 577, 582 (2d Cir. 1993)(Functional packaging and product design are unprotected). In paragraph 10 of Mr. Macco's declaration, Ronin asserts that it "supplies at least some of its car antennas in tubular packaging, which includes white, schematic-style graphics in the background, with various print,". (sic) Paragraph 10 is incomplete but confirms that Ronin uses tubular packaging "some" of the time.  Paragraph 11 is missing from Mr. Macco's declaration.  Mr. Macco fails to provide a complete description of what Ronin considers to be its packaging trade dress.  In a single conclusory statement in paragraph 12, Mr. Macco states that Ronin "has established trade dress rights in its packaging includes the shape, color and layout, graphics, scheme, and print on its tubular packaging, bag packaging, and instruction sheet."  Although Mr. Macco includes photographs, nothing in his declaration specifically describes the alleged trade dress.

Moreover, Mr. Macco states that only _some_ of Ronin's car antennas are supplied using this broad, ambiguous and incomplete description, there is no evidence that associates the trade dress packaging with the bullet antennas at issue in this case.  Import Global and the Court are left to speculate.  Even then, Ronin's broad claimed trade dress in its tubular packaging and plastic bags with black and white lettering is nothing more than the natural and obvious choice for shipping a cylindrical antenna and providing instruction on disposable plastic bags. The use of a tubular container for a cylindrical product and plastic bags with instructions is purely functional, as it provides the most efficient and protective means of packaging and shipping the bullet antenna and its accessories.

Ronin's claimed trade dress elements—black coloring with white lettering and graphics— are commonplace design choices that have long been used in product packaging across various industries. The Supreme Court has made clear that such basic product design elements, including color schemes, cannot be inherently distinctive. *Wal-mart Stores, Inc. v. Samara Bros.*, 529 U.S. at

211-12.   The combination of a black background with white text and graphics is a standard aesthetic choice that serves the functional purpose of ensuring readability and visual appeal, particularly in the automotive accessories market where such color schemes are prevalent.

To succeed on a trade dress infringement claim, a "plaintiff must prove each of the following three elements to make out a trade dress infringement claim: (1) "its trade dress is inherently distinctive or has acquired secondary meaning"; (2) "its trade dress is primarily non-functional"; and (3) the defendant's trade dress is so similar to the plaintiff's that it is likely to cause confusion." *J-B Weld Co., LLC v. Gorilla Glue Co.*, 978 F.3d 778, 788 (11th Cir. 2020).  Ronin has not proffered any evidence that its tubular packaging and other packaging and lettering is primarily non-functional.  It cannot.

Here, the tubular shape of Ronin's packaging is a direct result of the antenna's cylindrical form, and the black coloring with white graphics represents nothing more than an obvious and commonplace design choice for automotive accessories. Ex. 1.  Indeed, the tubular packaging is not manufactured by Ronin and is the generic product design of another vendor who provides packaging for product sellers.  Such functional packaging choices cannot form the basis of protectable trade dress rights without Ronin first presenting proof of it being primarily non-functional and having acquired secondary meaning.  Ronin has failed to provide such proof.

More importantly, Ronin's motion refers to portions of Mr. Macco's declaration which do not exist in support of its arguments about the alleged likelihood of confusion. On page 8 of the motion, Ronin cites to paragraph 21 of the Macco declaration in support of the packaging argument.  However, that paragraph is not included in Mr. Macco's declaration and the images in the motion are comparing two different types of products.

More egregious is the false claim on page 9 of the motion that Import Global is the source of the instruction sheet imaged in the motion and labeled by Ronin as "Defendants' instruction sheet". Ronin's motion refers to paragraph 22 of Mr. Macco's declaration as the evidence for this representation to the Court. Like paragraph 21, Mr. Macco's declaration does not include paragraph 22. Instead, the declaration includes an image of the instruction sheet with no statement from Mr. Macco as what the image is, the source of the image, or any allegation that this is Import Global's instruction sheet. One can only presume that Mr. Macco knew that this was not Import Global's instruction sheet and removed any statements about it from his declaration but let the image remain hoping the implication would be enough. Nevertheless, Ronin's motion cites to non-existent evidence to support its false claim to the Court that the image is an Import Global instruction sheet. It is not. See Ex. 1, paragraph 23-25. Accordingly, the Court should disregard the motion in its entirety for make such false claims or at least deny the trade dress claims.

Moreover, Import Global's tubular packaging includes a combination of functional instructional language and use of its registered trademarks. Import Global includes an image of its product with its own logo and its registered trademark "badass bullet antenna". Import Global has the right to use an image of its product and its own registered trademarks on its packaging and Import Global's use of those trademarks cannot be the basis for a finding of likelihood of confusion.

**D. Ronin has no trade dress rights in its "style of doing business"**

Ronin alleges trade dress protection in its "style of doing business" but fails to adequately articulate and describe the trade dress with enough particularity to enable Import Global to understand and defend it. *See discussion infra.* Mr. Macco, describes Ronin's "style of doing business" as Ronin's "product packaging, product instructions, and Plaintiff's online marketplace presentation, configuration and layout". Mr. Macco presents its Amazon listing as an example of

this style of doing business. Ronin cannot claim trade dress rights in Amazon's standardized marketplace presentation. Mr. Macco offers no evidence that Ronin controls Amazon's layout or that consumers uniquely associate the common practice of showing products alongside installation photos with Ronin's brand. Indeed, this presentation format is dictated by functional considerations—since vehicle antennas are standardly mounted on the right side, sellers must necessarily place product images on the left to demonstrate installation, a practice widely used throughout the industry. It is used by numerous other sellers.  Exhibit 14.

It is also important to understand that the truck images used by Ronin and Import Global or third-party stock images which are licensed by third parties such as shutterstock.com or adobe.com to be used in advertising or wherever an image of a truck may be needed.  The choice of the vehicle is dictated by the compatibility with the antenna being sold.  Each antenna is marketed to be compatible with a particular vehicle.

In Ronin's example listing, a Ford truck is shown with an antenna that is compatible with a Ford truck.  In the example presented by Mr. Macco, Ford Motor Company's trademarks are more predominately displayed in the listing than Ronin's.  The listing includes the following Ford trademarks: 1) Ford; 2) F150; 3) F250; 4) F350 Super Duty; 5) Ford Raptor; 6) Ford Bronco; 7) Ford F-150 Accessories; 8) F150 Antenna; and 9) Replacement Ford F150 Antenna.  The image included is stock image of a Ford designed truck which makes Ford responsible for all of the design elements of the truck and the stock image owner responsible for the image itself.  The name Ronin appears once in the listing along with an Amazon provided link to the "Ronin Factory Store".  It is clear from the listing and the number of Ford trademarks used that Ronin has created the listing with the intent to capture consumers searching on the Ford name and Ford trademarks and not anyone searching for Ronin.  A consumer is more likely to believe that this listing is associated

with Ford Motor Company than they would Ronin.  Finally, Amazon is the author and designer of the overall page layout for all of the listings presented on its site.  Amazon has standardized its listings so that any side-by-side comparison of those listings will look very similar.

### E.  There is no likelihood of confusion under any trade dress theory

The Eleventh Circuit's seven-factor test for likelihood of confusion weighs against Ronin's claims under all trade dress theories—product design, packaging, and alleged "style of doing business." See *Frehling Enterprises, Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999) (enumerating factors).

First, Ronin's claimed trade dress is non-existent or at best extraordinarily weak across all categories of trade dress. The Supreme Court has explicitly held that like product design, color cannot be inherently distinctive. *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. at 211-12. Black is a common aesthetic choice for automotive accessories, and Ronin presents no evidence that consumers associate black antennas exclusively with Ronin. Similarly, Ronin's claimed packaging and "style of doing business" trade dress merely reflects industry standards—tubular packaging for elongated products and standard product imaging showing both close-up and installation views.

Second, Import Global offers its antennas in multiple colors and designs, clearly differentiating its product line from Ronin's black offerings. Ex. 1; Ex. 3. The company's packaging prominently displays its own registered trademarks, including "badass bullet antenna," and its product images bear Import Global's distinctive branding. *Id.*

Third, marketplace realities derail Ronin's confusion claims. For online sales, consumers never see the packaging until after purchase, eliminating any possibility of point-of-sale confusion based on disposable packaging trade dress. There's no evidence that such disposable packaging received days after the purchase is made translates back to an association with Ronin at the point of sale.  Moreover, Amazon's standardized marketplace format and requirements constrain how

16

all sellers present their products, making any similarity in online presentation a function of the online platform rather than copying. ****Notably, Ronin's own Amazon listings emphasize vehicle manufacturer branding (showing Ford trademarks nine times) over Ronin's brand (appearing once), suggesting consumers focus on vehicle compatibility rather than source identification.

Finally, Ronin's evidence of actual confusion is based on the speculative and conclusory statements of its sole owner.  A single customer email and handful of returns over years of sales cannot support the extraordinary remedy of preliminary injunction, particularly given the volume of competitors in the market. *See Miller's Ale House, 702 F.3d at 1324.*  This minimal showing more likely reflects Amazon's search algorithm placement where Ronin may have paid extra to be higher on the search list rather than actual confusion.  Moreso, where customers can easily check their order history to identify previous sellers. Mr. Macco's speculation about consumer confusion cannot substitute for concrete evidence.

In sum, Ronin fails to establish likelihood of confusion under any trade dress theory, precluding preliminary injunctive relief.

## V.      RONIN CANNOT PREVAIL ON ITS TRADEMARK INFRINGEMENT CLAIM

Ronin's trademark infringement claim fails because the Import Global mark is distinctly different from Ronin's logo and is not likely to cause confusion. The two marks are as follows:

                                                    

These marks are completely dissimilar. In its trademark application and registration certificate Ronin described its mark as "consisting of four parallelograms where two are each

layered over the other, intersecting at a central location in a downward direction to form the shape of a V. Each parallelogram has a pronounced border, where the intersection creates an internal criss-cross pattern defining the external border of the mark." Ronin's description reveals a fundamental misunderstanding by Ronin of its own mark, as it lacks true parallelograms—geometric shapes defined by two pairs of parallel sides. Instead, Ronin's logo comprises four trapezoids, which are distinctively different.

Import Global's logo bears no resemblance to Ronin's chevron-style mark. While Ronin's trademark consists of intersecting geometric shapes, Import Global's logo features three curved, non-intersecting lines which appear to evoke bull horns—a clever play on "bullet" that creates a wholly distinct visual impression. Ronin improperly attempts to bootstrap similarity by focusing on the bullet-shaped products rather than comparing the individual marks. When properly analyzed, the logos are different both visually and under Ronin's own trademark description. Moreover, Ronin's evidence of confusion consists solely of its owner's speculative assertions about unsubstantiated emails and returns, falling far short of demonstrating any likelihood of confusion between these marks.

## VI.     PLAINTIFF CANNOT PREVAIL ON ITS COPYRIGHT INFRINGEMENT CLAIM

Ronin's copyright infringement claim mischaracterizes the nature and scope of its alleged copyright protection. The image Ronin seeks to protect under its asserted registration is, at most, a derivative work combining two pre-existing elements: (1) a stock third-party image of a Ford Raptor truck, and (2) a computer-generated rendering of a .50 caliber bullet antenna that merely reproduces the standard dimensions and appearance of ammunition widely used in the industry and Ronin's logo.

It is well established that derivative works receive limited copyright protection for the derivative owner. "A derivative work may itself be copyrighted if it has the requisite originality. However, the copyright is limited to the features that the derivative work adds to the original." *Pickett v. Prince*, 207 F.3d 402, 405 (7th Cir. 2000); see *Stewart v. Abend*, 495 U.S. 207, 223, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990). Moreover, the copyright of a derivative work is invalid if the creator failed to obtain rights to create derivative works from the original copyright owner. See 17 U.S.C. § 103(a).

Here, Ronin's copyright claim of infringement fails for multiple reasons. First, Ronin has not demonstrated that it obtained authorization from the owner of the Ford Raptor truck stock photograph to create a derivative work for which it filed for copyright protection. Without such authorization, Ronin's copyright registration may be invalid. Second, even if valid, Ronin's copyright protection would extend only to its <u>creative</u> contributions to the composite image— which are minimal. The computer rendering of the bullet antenna merely depicts Ronin's shape and design of its .50 caliber bullet antenna and logo, lacking any original artistic expression. In the image, Ronin appears to have smeared the Ford Raptor name from the grill of the truck and added its name and logo on the windshield.  Ronin claims that the arrangement of the individual antenna on the left side of the image of the truck is part of the creative contribution.  However, that arrangement—placing the bullet antenna product and installation images side-by-side—simply follows industry convention for automotive aftermarket products sold through online marketplaces.  Ex. 1.

The arrangement is not creative expression but rather dictated by the marketing requirements for marketing a small accessory that is to be installed on the exterior of a truck.  *Id.* To effectively market these antennas requires both a detailed shot of the antenna and an installation

view, as evidenced by virtually all Amazon listings. *Id.* While Ronin claims copyright protection for placing the antenna image on the left side, this placement is functionally dictated by the universal location of vehicle antennas on the right side of trucks. The left-side placement is thus a practical necessity, not a creative choice, to visually connect the product with its installation. *Id.*

This type of arrangement is squarely within the *scènes à faire* and merger doctrines where "standard elements in a genre —called scènes à faire in copyright law—get no copyright protection. *Design Basics, LLC v. Signature Constr., Inc.*, 994 F.3d 879, 889 (7th Cir. 2021). "Scènes à faire are so rudimentary, commonplace, standard, or unavoidable that they do not serve to distinguish one work within a class of works from another." *Id.* "If standard elements received copyright protection, then the creation of a single work in a genre would prevent others from contributing to that genre because the copyright owner would have exclusive rights in all of the genre's basic elements." *Id.*

Similarly, the "merger doctrine prevents the use of copyright to protect an idea or procedure" because "an idea or procedure can be expressed in only a few ways, it is easy to copyright every form in which the idea can be expressed, indirectly protecting the idea itself." *Id*(citing 4 Nimmer on Copyright § 13.03[B][3]). Accordingly, "to guard against this kind of overprotection, when an idea can be expressed in only limited ways, courts say the expression 'merges' into the idea and cannot receive copyright protection." *Id.*

Import Global uses licensed stock images of vehicles to demonstrate product compatibility – Ford antenna for Ford truck -- not to copy Ronin's presentation. While both parties may use Ford truck stock images to show antenna installation, they feature different truck models for different antenna listings and Import Global creates its own product renderings. Ronin's attempt to leverage a copyright registration in a derivative work of a third-party stock image to monopolize standard

product presentation formats exceeds the scope of copyright protection under the scènes à faire and merger doctrines and falls short of the burden required for preliminary injunctive relief.

## VII.   RONIN CANNOT SHOW IRREPARABLE HARM

Ronin fails to meet its burden of establishing irreparable harm, which cannot be presumed in intellectual property cases. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). Ronin's irreparable harm argument rests entirely on unsubstantiated claims of trade dress rights and actual confusion, supported only by the speculative and conclusory declaration of its sole owner.

Ronin's price erosion theory similarly fails. The record shows dozens of vendors on Amazon.com selling comparable antennas in Import Global's price range, and Ronin maintains its lower pricing even after successfully triggering Amazon's automated system to remove Import Global's listings. Ex. 1.  This reflects normal market competition—consumers' unwillingness to pay premium prices for essentially identical aluminum bullet antennas—not irreparable harm justifying the extraordinary remedy of preliminary injunction. Like all small businesses, Ronin is entitled to compete in a free market, not a competition-free market.

## VIII.   THE BALANCE OF HARDSHIPS TIPS SHARPLY IN FAVOR OF IMPORT GLOBAL

A preliminary injunction against Import Global would be devasting to its business as it would remove one of its best-selling product lines from the market and its revenue stream. However, Ronin would still be in competition with vendors like ESP Performance and AmmoTenna who were in the market years before Ronin and continue to be in the market.  Further, Ronin would still be competing with the numerous other vendors on Amazon who are selling similar products.  Import Global would be devastated and Ronin would have simply removed one of its competitors on the basis of a non-existent trade dress argument and a non-infringed trademark.  Under this analysis, the balance of hardships tips sharply in favor of Import Global.

### IX.     CONCLUSION

The Court should deny Plaintiff's Motion for Permanent Injunction.

### X.     REQUEST FOR ORAL ARGUMENTS

Pursuant to the Local Rules of this Court, Defendant Import Global respectfully requests oral argument on Plaintiff's Motion for Preliminary Injunction.  The issues presented are complex and involve multiple areas of intellectual property law including trademark, trade dress, and copyright.  Additionally, there are significant evidentiary issues related to the evidence presented by Plaintiff in support of the motion.  Defendant estimates that one hour will be sufficient for oral argument.

Date: January 10, 2025.              Respectfully submitted,

*/s/ Mendy Lieberman*
Mendy Lieberman
Florida State Bar: 93226
The Lieberman Law Firm, P.A.
Mlieberman@sflatty.com
20801 Biscayne Blvd., Suite 304
Miami, FL 33180
Phone: (305) 682-8500

**ATTORNEYS FOR DEFENDANTS IMPORT GLOBAL, LLC, ABRAHAM HABOSHA AND LINDSAY MILLER**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 10, 2025, the foregoing document was served on all counsel of record, via the Court's CM/ECF Document Filing System.

<u>*/s/ Mendy Lieberman*</u>
Mendy Lieberman