United States District Court
for the
Southern District of Florida

| | | |
|---|---|---|
| Ronin Factory, LLC, Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 24-24700-Civ-Scola |
| | ) | |
| Import Global, LLC, Abraham | ) | |
| Habosha, and Lindsay Miller, | | |
| Defendants. | | |

## Order Denying Motion for Preliminary Injunction

This cause comes before the Court upon the Plaintiff Ronin Factory LLC's Amended Motion for Preliminary Injunction (ECF No. 32). The Defendants Import Global, LLC; Abraham Habosha and Lindsay Miller have responded (ECF No. 33), and the Plaintiff has not filed a reply. The time to file a reply having passed, the motion is now ripe for review. The Court has considered the briefing, the record, the relevant legal authorities, and is otherwise fully advised. For the reasons that follow, the Plaintiff's motion (**ECF No. 32**) is **denied**.

### 1. Factual Background

Since August 2017, Ronin has sold car antennas, among other items. (Pl.'s Mot., at 1.) Ronin's car antenna at issue in this motion, which is in the shape of a bullet, contains Ronin's trademark U.S. Trademark Registration 6,399,843, which Ronin has been using since 2018. (*Id.* at 2.) The antenna with Ronin's mark, which it refers to as its "chevron" mark, is marketed on its website (roninfactory.com) and third party websites such as Amazon, is reproduced below.



(ECF No. 27-1, Macco Decl. ¶ 17.) Ronin has enjoyed success in its business venture, receiving about $5 million in revenue per year. (*Id.*)

Ronin typically "presents its product listing using [Ronin's] image, showing an up-close view of the product (at left) and an image of the product installed on a vehicle (at right)," (Pl.'s Mot., at 3), as shown below.



(ECF No. 27-1, Macco Decl. ¶ 4.) Ronin has copyrighted this image as Copyright Registration No. VA-2-395-784. (Pl.'s Mot., at 1.) Ronin has spent more than $10,000,000 in advertising since 2017. (Pl.'s Mot. at 4.) It considers itself "one of the market leaders for the style of replacement antenna products that are at issue in this lawsuit." (*Id.*)

But Ronin believes one of its competitors, the Defendants, have run afoul of legal marketplace competition. Ronin accuses the Defendants of "engag[ing] in what can only be described as an intentional knock-off campaign, copying nearly every aspect of [Ronin's] business." (*Id.*) The Defendants began to sell their at-issue bullet antenna on December 16, 2022. (Defs.' Resp., at 4.) As evidence of this "knock-off campaign," Ronin includes in its motion a comparison of Ronin and the Defendants' Amazon listings, reproduced below (with Ronin's listing on top, and the Defendants' at bottom).





(Pl.'s Mot., at 4-5.) Ronin also believes that the Defendants have copied its product packaging, including the shape, layout, color, and text of the packaging, as well as its instructions:













 

(*Id.* 5-6.)[1] Ronin contends that as a result of Defendants' actions, "consumers have been confused as to the origin of the products they are purchasing." (*Id.* at 7.) As evidence, Ronin cites one email from a customer who thought he or she had purchased Ronin's antenna, but who actually had purchased the Defendants'. (*Id.* at 7-8.) Additionally, Ronin's owner, Scott Macco, alleges that "[o]n at least five occasions, customers have purchased Defendants' products on Amazon and subsequently returned" them to Ronin, and Ronin "has also encountered confusion with Amazon employees, who have confused [Ronin's] antenna product for Defendant[s'] antenna product. (Macco Decl. ¶¶ 27, 29.)

Ronin argues that it has had to reduce the price of its antenna from $40 to $20 and increase its Amazon advertising by $20,000 per month. (*Id.* at 8-9.)

---

[1] The instruction sheet on the left is, according to Ronin, the Defendants', while that on the right is Ronin's.

It also claims that it has lost market share. (*Id.* at 9.)

Ronin now seeks a preliminary injunction based on its trademark infringement, trade dress, and copyright infringement claims. Ronin seeks Court orders directing that the Defendants must (1) stop using Ronin's trademark or any mark that is confusingly similar; (2) stop using Ronin's image; (3) stop using Ronin's style of doing business; and (4) place into escrow all funds received from the sale of car antennas. (Pl.'s Mot., at 19.)

## 2. Legal Standard

To obtain a preliminary injunction, a party must demonstrate "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that the entry of the relief would serve the public interest." *Schiavo ex. rel Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (per curiam).

## 3. Analysis[2]

Because the Court finds that Ronin has failed to show that it is likely to succeed on the merits of any of its claims, the Court denies Ronin's motion and need not analyze the last three elements necessary for a preliminary injunction. The Court takes each of Ronin's claims in turn.

### A. Trademark Infringement Claim

#### 1. Likelihood of Success on the Merits

Under 15 U.S.C. § 1114,[3] "[t]rademark infringement . . . occurs when a defendant, without consent, uses 'in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark' that is 'likely to cause confusion' that a relationship exists between the parties." *FCOA LLC v. Foremost Title & Escrow Srvs. LLC*, 57 F.4th 939, 946 (11th Cir. 2023) (quoting 15 U.S.C. § 1114(1)). Thus, "a plaintiff must demonstrate that (1) it owns a valid mark with priority, and (2) that the defendant's mark is likely to cause

---

[2] Nothing from the Court's analysis should be construed as it commenting on the ultimate merits of Ronin's claims. Rather, the Court is analyzing the claims in the context of the high burden Ronin has when seeking injunctive relief.

[3] In its motion, Ronin cites the standard for a trademark infringement claim under 15 U.S.C. § 1115. However, Count I of Ronin's complaint brings a trademark infringement claim under 15 U.S.C. § 1114. (*See* ECF No.1, Compl. at 20.) The Court thus analyzes the motion under the § 1114 standard.

confusion with the plaintiff's mark." *Id.* (citation omitted). There are two ways in which a consumer may be confused: "[f]irst, a consumer could be confused about the source of the marks, thinking that the goods or services associated with a second mark are produced by the original mark holder;" or "[s]econd, a consumer may be confused as to the existence of an affiliation, connection, or sponsorship between the parties." *Id.* at 946 n.9.

Ronin's trademark is registered as U.S. Registration 6,399,834. This is "prima facie evidence of the validity of the registered mark." 15 U.S.C. § 1115(a). Therefore, at issue is whether Ronin has established that it is likely to succeed on the second element of its trademark infringement claim— likelihood of confusion.

"The likelihood of confusion analysis involves two steps. At step one, the court considers several factors which can provide circumstantial evidence of likelihood of confusion." *FCOA LLC*, 57 F.4th at 947. "At step two, the court weighs each of the relevant circumstantial factors—independently and then together—to determine whether the ultimate fact, likelihood of confusion, can reasonably be inferred." *Id.*

There are seven factors that the Court must consider when determining the likelihood of confusion:

> (1) the strength of the allegedly infringed mark; (2) the similarity of the infringed and infringing marks; (3) the similarity of the goods and services the marks represent; (4) the similarity of the parties trade channels and customers; (5) the similarity of advertising media used by the parties; (6) the intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.

*Id.* (citation omitted). "[C]onsumer sophistication" may also be considered; however, "the two most important circumstantial facts [or factors] are respectively actual confusion and the strength of the mark." *Id.* (citation omitted).

### a. Strength of Ronin's Mark

"[T]he strength of a mark . . . determines the scope of the mark's protection." *Id.* (citation omitted). There are "two steps in assessing the strength of a mark: conceptual strength and commercial strength." *Id.* "Conceptual strength describes the *potential* of a mark to aid consumer recognition," while "[c]ommercial strength refers to the real-world consumer recognition of a mark, most often created by the efforts and work of the mark

holder." *Id.* at 949-950 (citation omitted). The Court analyzes both in turn.

Conceptual strength is determined by characterizing a mark as one of four terms, "from weakest to strongest: (1) generic, (2) descriptive, (3) suggestive, and (4) fanciful and arbitrary." *Id.* at 949 (citation omitted). The Eleventh Circuit aptly explained the characteristics of each type of mark in *FCOA LLC*:

> Generic marks refer to a class of which an individual service is a member (e.g., "liquor store" used in connection with the sale of liquor). Descriptive marks describe a characteristic or quality of an article or service (e.g., "vision center" denoting a place where glasses are sold). "Suggestive terms suggest characteristics of the goods and services and require an effort of the imagination by the consumer in order to be understood as descriptive." For instance, "penguin" would be suggestive of refrigerators. An arbitrary mark is a word or phrase that bears no relationship to the product (e.g., "Sun Bank" is arbitrary when applied to banking services).

*Id.* (cleaned up). Here, Ronin believes that its mark is fanciful and arbitrary. (Pl.'s Mot., at 12.) The Defendants do not seem to object to this characterization. (*See generally* Defs.' Resp.)

The Court agrees. Ronin's chevron logo "bears no relationship" to the antenna products it sells. *FCOA LLC*, 57 F.4th at 950 (citation omitted). Therefore, the conceptual strength of Ronin's mark is the strongest of the four categories of trademarks. *See id.*

Now, the Court must analyze the commercial strength of Ronin's mark. "[D]etermining the strength of any mark requires weighing either or both circumstantial evidence of advertising and promotion and direct evidence of consumer recognition, such as by survey." *Id.* at 950 (cleaned up). "Commonly used evidence of commercial strength includes third party use; advertising and promotion; sales and number and types of customers; recognition by trade, media, and customers; and survey of likely customers." *Id.* (citation omitted).

Ronin does not directly address the issue of commercial strength, but its motion does reference purported evidence of commercial strength throughout. Ronin has annual sales of about $5 million, through roninfactory.com and third-party websites such as Amazon. (Pl.'s Mot., at 2 (citing Macco Decl., ¶ 5).) Ronin has also spent more than $10,000,000 in marketing and advertising, and considers itself as "one of the market leaders for the style of replacement antenna products that are issue in this lawsuit." (*Id.* (citing Macco Decl. ¶¶ 14, 16).) And when addressing its trade dress claim, Ronin

argues that "[t]here is a conscious connection in the mind of the consumer between the trade dress and [Ronin's] business" because Ronin "has over 7,800 reviews on Amazon, averaging 4.7 out of 5 stars, with 85% of the reviews being five-star reviews." *Id.* (citing Macco Decl. ¶ 15).)

This evidence fails to show the likely actual commercial strength of Ronin's chevron logo. Though Ronin has spent millions in marketing and advertising, "in isolation, evidence of promotion <u>efforts</u> is not sufficient to establish a mark's commercial strength because it tells us precious little about the efficacy of those efforts in creating marketplace recognition . . . ." *FIU v. Fla. Nat'l Univ.*, 830 F.3d 1242, 1259 (11th Cir. 2016). Ronin claims that it is now "one of the market leaders" in antenna products, but that statement is conclusory and not supported by any evidence. (*See* Pl.'s Mot., at 2 (citing Macco Decl. ¶ 16).) Nor does the Court see the relevance of Ronin's positive reviews on Amazon and its website—these reviews show the favorability of those who use Ronin's products, rather than the commercial strength of the mark or its products. For example, Ronin does not establish how many reviews other competitors have; the average reviews of competitors' products; Ronin's sales compared to those competitors; and, perhaps most importantly, any actual evidence that customers associate the chevron logo with Ronin and its products.

Therefore, Ronin has failed to establish the commercial strength of its mark and, relatedly, that this factor weighs in its favor.

### b. <u>Similarity of the Marks</u>

The next factor the Court considers is the similarity of the parties' marks. "The greater the similarity, the greater the likelihood of confusion." *FCOA LLC*, 57 F.4th at 952 (citation omitted). This analysis is a "subjective eyeball test," because the Court must "consider the overall impressions that the marks create, including the sound, appearance, and manner in which they are used, rather than comparing isolated features." *Id.* (cleaned up). Thus, "the marks don't need to be identical to support a finding of similarity, because the key is to determine if the similarities are sufficient to deceive the public." *Id.*

The Court agrees with Ronin that the marks are similar, and that this factor weighs in its favor. In disputing the marks' similarities, the Defendants err by viewing the marks in isolation. (*See* Defs.' Resp., at 18 ("Ronin improperly attempts to bootstrap similarity by focusing on the bullet-shape products rather than comparing the individual marks.").) But as the Court notes above, the Court must consider, among other features, "the manner in which [the marks] are used." *FCOA LLC*, 57 F.4th at 952 (citation omitted). Both marks are used on the bullet-shaped products, and both are in a

somewhat reverse triangular shape (with Ronin's bullet antenna on the left, and the Defendants' on the right), as reproduced below.



(Pl.'s Mot., at 11.) This reverse triangular shape is the most distinctive part of both marks. *See FCOA LLC*, 57 F.4th at 952-53 ("Our analysis focuses on the distinctive parts of marks." (citation omitted)). Thus, "[t]he logos create a similar overall effect and accentuate the marks' similarities." *Id.*

The Defendants also make irrelevant arguments with respect to this factor. For example, the Defendants argue that "Ronin's description reveals a fundamental misunderstanding by Ronin of its own mark, as it does not include any parallelograms which are geometric shapes defined by two pairs of parallel sides." (Defs.' Resp., at 17.) That may be so. But it doesn't affect the similarity of the two marks.

Therefore, because the parties' marks are similar, this factor likely weighs in Ronin's favor.

c. Similarity of the Products

The next factor is the similarity of the products at issue, which "concerns whether the products are of a kind the public could *think* originate from a single source." *FCOA LLC*, 57 F.4th at 953. This factor undoubtedly weighs in Ronin's favor, because the parties both sell bullet-shaped antenna products meant to be placed onto the front of automobiles.

d. Similarity of Trade Channels and Customers

Next, the Court must consider the "similarity of trade channels and customers, [which] focuses on where, how, and with whom the parties transact with their actual and potential customers." *Id.* (cleaned up). "The primary focus in this inquiry is on the overlap of the customer bases, because the greater the overlap, the greater the likelihood that consumers will be exposed to both marks and become confused." *Id.* (citation omitted). Moreover, "the similarity of trade channels analysis focuses on whether the medium (e.g., stores, agents, online, mail, etc.) that customers frequent would expose them to both marks, not on whether the products or services are sold in the same location or manner." *Id.* (citations omitted).

Given that the products are similar—if not the same—it is no surprise that "both parties target[] the same type of individuals," *i.e.*, those seeking bullet-antennas for their automobiles. *See id.* Additionally, one of the mediums at issue, Amazon, inevitably "expose[s] [customers] to both marks[.]" *Id.* A search for bullet antennas yields results for both parties' products. The Defendants themselves note that "[a] review of Amazon.com reveals that there are approximately 70 unique sellers of bullet antennas on amazon.com who cumulatively offer approximately 296 unique products of similarly styled bullet antennas and whose product imaging and marketing are all similar." (Defs.' Resp., at 6 (citing ECF Nos. 33-1, 33-14).) Thus, the trade channels and customers for both parties' products are similar, if not identical.

e. Similarity of Advertising

The fifth factor, "similarity of advertising, focuses on the audience reached by the advertisements of the parties." *Id.* (citation omitted). "[T]he greater the overlap or similarity of the audiences, the greater the likelihood of confusion." *Id.* (citation omitted). The Court must analyze "whether the overlap in readership of the parties' advertisements is significant enough that a possibility of confusion could result in a fashion very similar to" the similarity

of trade channels and customers. *Id.* (cleaned up.)

The parties—most notably, Ronin, given that it is its burden on this motion—do not provide much detail of their advertising beyond the *amount* that each party spends on advertising. The most specific Ronin gets is when it says that it "has had to increase its advertising spend on Amazon by about $20,000 per month since July 2023 as a direct result of Defendants' knockoff campaign." (Pl.'s Mot., at 10 (citing Macco Decl., ¶ 30).) However, the Defendants seem to concede that the parties' advertising is similar. (*See* Defs.' Resp., at 6-7 (noting that the sellers of bullet antennas on Amazon have "product imaging and marketing [that] are all similar . . . Each of these vendors uses images of their products along with images of the products being installed on trucks. This is standard practice for marketing tuck accessories such as antennas").) And with respect to Ronin and the Defendants, they advertise almost in the same exact manner on Amazon. *See infra* 3.A.1.e.

Therefore, the Court finds that Ronin is likely to succeed in showing that there is similarity of advertising.

### f.  Defendants' Intent

The sixth factor is the defendants' intent to confuse consumers. Ronin does not provide any evidence that the defendants intended to confuse consumers, beyond conclusory statements that the Defendants engaged in a "knock-off campaign." (*See, e.g.*, Pl.'s Mot. at 5.) But intentional copying is not enough to show that this factor weighs in favor of Ronin because "[t]here is a difference between intentional copying and intentional copying *with intent to cause confusion.*" *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1293 (11th Cir. 2018) (citation omitted). If a defendant copies a product without such intent, "the defendant's intent has little bearing on the ultimate question: whether the allegedly infringing product is likely to confuse consumers." *Id.* (citation omitted). Ronin has not shown that this factor likely weighs in its favor.

### g.  Actual Confusion

The seventh, and most important, factor, is actual confusion. This factor "asks whether there is evidence in fact of confusion." *FCOA LLC*, F.4th at 956 (citation omitted). Ronin claims that "there is evidence of actual confusion, as customers have contacted Plaintiff after purchasing Defendants' products and have returned Defendants' products to Plaintiff." (Pl.'s Mot., at 13.) Ronin specifically cites one email from a customer "who purchased Defendants'

product but contacted [Ronin] about having the product replaced after it was stolen." (Macco Decl. ¶ 26.) Macco also states that "[o]n at least five occasions, customers have purchased Defendants' products on Amazon and subsequently returned Defendants' products to [Ronin] seeking a refund," and that Ronin "has also encountered confusion with Amazon employees, who have confused [Ronin's] antenna product for Defendant[s]' antenna product." (*Id.* ¶¶ 27, 29.)

Had Ronin provided evidence supporting Macco's allegations, whether it had showed enough for actual consumer confusion would have been a close call because "the Eleventh Circuit's case law makes clear that even a few instances of consumer confusion can be sufficient to establish actual confusion." *Uber Promotions, Inc. v. Uber Tech., Inc.*, 162 F. Supp. 3d 1253, 1275 (N.D. Fla. 2016) (citing *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1166-67 (11th Cir.1982); *AmBrit. Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1544 (11th Cir. 1986)). "This is because 'actual confusion by a few customers is evidence of a likelihood of confusion by many customers." *Id.* (quoting *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1185 (11th Cir. 1985)) (cleaned up). However, a self-serving affidavit by Ronin's owner, without actual evidence, that serves as the basis for most of Ronin's evidence in support of its motion for injunctive relief is insufficient. *See Atleisure, Inc. v. Ace Evert Inc.*, CIVIL ACTION NO. 1:12-CV-1260-CAP, 2013 WL 12099363, at *8 (N.D. Ga. June 6, 2013) ("Conclusory statements by an officer of the moving party are of limited probative value . . . Moreover, courts are wary of issuing an injunction based solely upon allegations and conclusory affidavits submitted by the plaintiff." (cleaned up)).

Therefore, Ronin has not established that there is likely actual confusion between the parties' marks.

h. <u>Consumer Sophistication</u>

The Eleventh Circuit "ha[s] recognized that consumer sophistication may also be relevant to assessing likelihood of confusion." *FCOA LLC*, F.4th at 957 (collecting cases). Because the parties—and specifically Ronin—have not discussed this factor, the Court declines to balance this factor in either party's favor. *Cf. id.* ("As both the parties and the District Court considered consumer sophistication, we find it appropriate to do so as well. In so doing, we recognize only that consumer sophistication may impact likelihood of confusion and do not require that the factor be considered in every, or even most, likelihood of confusion analyses." (citations omitted)).

i. <u>Balancing the Factors</u>

To summarize, Ronin has shown that it is likely to succeed in demonstrating that (1) its and the Defendants' marks are similar; (2) the parties' sell similar (if not the same) products involving the at-issue marks; (3) their trade channels and customers overlap; and (4) their advertising audiences overlap. However, Ronin has not shown that it is likely to succeed in demonstrating that: (1) its mark has commercial strength; (2) the Defendants intended to cause consumer confusion, or (3) there is actual consumer confusion.

Weighing these factors, the Court finds that Ronin has not demonstrated that it is likely to succeed in showing that there is a likelihood of consumer confusion. Ronin simply has not carried its weight in providing evidence on the two most important factors in the likelihood of confusion analysis—strength of the mark and actual confusion. In terms of actual confusion, "[t]hough it is the most important circumstantial fact, it is not a requirement for finding a likelihood of confusion." *Id.* (citation omitted). What is required depends on the circumstances of each case, including "the extent of advertising, the length of time for which an infringing product has been advertised, and any other factors that might influence the reporting of actual confusion." *Id.* (citation omitted). "[A] lack of evidence showing actual confusion can be discounted when there is not an 'adequate period of time' for actual confusion to develop among consumers. *Id.* (quoting *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1362-63 (11th Cir. 2019)).

Here, however, the lack of evidence of actual confusion is important because both marks have been in the market since December 16, 2022, when the Defendants introduced its bullet antenna into the market. (Defs.' Resp., at 4); *see Hard Candy*, 921 F.3d at 1362 ("If consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected either by survey or in actual reported instances of confusion, that can be powerful indication that the junior trademark does not cause a meaningful likelihood of confusion." (citation omitted)). Like in *Hard Candy*, "there was enough opportunity for confusion to make the absence of any evidence significant." *Id.*

Because Ronin has failed to show a likelihood of confusion, it has failed to show that it is likely to succeed on the merits of its trademark infringement claim. Therefore, Ronin's motion for a preliminary injunction based on trademark infringement is denied.

### B. Trade Dress Infringement Claim

#### 1. Likelihood of Success on the Merits

Ronin also seeks injunctive relief based on alleged trade dress infringement. (Pl.'s Mot., at 13.) Ronin specifically seeks trade dress protection in "its style of doing business, including product design, packaging, and online marketplace layout[.]" (*Id.* at 13-14.)

"The term trade dress refers to the appearance of a product when that appearance is used to identify the producer." *Dippin Dots, Inc. v. Frosty Bites Distribution, LLC*, 369 F.3d 1197, 1202 (11th Cir. 2004) (citation omitted). "Trade dress involves the total image of a product and may include features such as size, shape, color, texture, graphics, or even particular sales techniques." *Id.* (cleaned up). To establish trade dress infringement, Ronin must show that "(1) the product design of the two products is confusingly similar; (2) the features of the product design are primarily non-functional; and (3) the product design is inherently distinctive or has acquired secondary meaning." *Id.* (citations omitted). Because "all three elements are necessary for a finding of trade dress infringement, any one could be characterized as threshold." *Id.* (citations omitted).

Ronin fails to show that it is likely to succeed on any of the three elements of its trade dress claim. To start, Ronin has not shown that its trade dress is inherently distinctive or has acquired secondary meaning. The Eleventh Circuit has clarified that product design can still be inherently distinctive in the context of trade dress infringement, even though the Supreme Court in *Wal-Mart Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210, 120 S.Ct. 1339, 1343, 146 L.Ed.2d 182 (2000), held that product design could not be so in the context of a trademark infringement case. *See Millers Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1323-24 (11th Cir 2012) (rejecting argument that the distinctiveness test was overruled by *Wal-Mart* and explaining that "[t]he Court said nothing, however, about the ongoing utility of the rest to determine whether or not *trade dress* might be inherently distinctive" (citation omitted)). Specifically, the Eleventh Circuit has stated that when determining whether trade dress is inherently distinctive, courts "must consider whether [the trade dress] is a common basic shape or design, whether it is unique or unusual in a particular field, and whether it is a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods." *Id.* at 1323. Ronin only states that its "trade dress in its style of doing, including product design, packaging, and online marketplace layout, is inherently distinctive[.]" (Defs.' Resp., at 13.) In other

words, Ronin has not analyzed these factors, and therefore has not shown that its trade dress is inherently distinctive.

Nor has Ronin showed that its trade dress has acquired secondary meaning. "Other trade dress, though not inherently distinctive, can become distinctive if it acquires 'secondary meaning, which occurs when, in the minds of the public, the primary significance of trade dress is to identify the source of the product rather than the product itself.'" *Id.* at 1322 (quoting *Wal-Mart Stores*, 529 U.S. at 211, 120 S.Ct. at 1343 (cleaned up).) Though "survey evidence is the most direct and persuasive evidence to establish secondary meaning," secondary meaning can be proven after consideration of four factors: "(1) [t]he length and manner of its use," (2) the nature and extent of advertising and promotion, (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the trade dress and the plaintiff's business," and (4) the extent to which the public actually identifies the trade dress with the plaintiff's products." *Vital Pharms., Inc. v. Monster Energy Co.*, 553 F.Supp.3d 1180, 1253 (S.D. Fla. 2021) (citations omitted).

In its attempt to show secondary meaning, Ronin notes that its implemented its style of business for more than six years and has spent more than $10,000,000 on advertising. (Pl.'s Mot., at 14.) To prove that "[t]here is a conscious connection in the mind of the consumer between the trade dress" and Ronin, Ronin states that it has over 7,8000 reviews on Amazon, with an average of 4.7 stars and 85% being five-star reviews. (*Id.*) Ronin also argues that the Defendants intentionally copied its trade dress, which is "probative evidence that trade dress has acquired secondary meaning." (Pl.'s Mot., at 13 (citing *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 860 (11th Cir. 1983).)

But this evidence doesn't get Ronin to where it thinks it does. First, Ronin doesn't include detail on its advertisements, *i.e.*, "the nature . . . of advertising and promotion." *Vital Pharms.*, 553 F.Supp.3d at 1253 (citations omitted). Second, and similarly, Ronin does not detail the efforts it has made to develop the conscious connection between its trade dress and its company. *See id.* Third, the Court disagrees that Ronin's favorable Amazon ratings show a connection between Ronin and the trade dress in the eye of a consumer. As the Court discussed, *infra* 3.A.1.a., these reviews show that consumers who used Ronin's product liked them, not that a consumer necessarily associates the trade dress with Ronin.  Fourth, and finally, Ronin has not shown that the Defendants have intentionally copied its trade dress. *See infra* 3.A.1.f.

As to the second element, whether the products are confusingly similar, Ronin states that all aspects of its "style of doing business are nonfunctional, as there are many alternative ways to present the product to the public . . ., to

package the product, and to brand the product with a mark that is not *confusingly similar* to Plaintiff's." (Pl.'s Mot., at 14-15 (emphasis added).) However, Ronin's argument presupposes that the parties' marks are confusingly similar. As the Court discussed above with respect to Ronin's trademark claim, *see infra* 3.A.1, Ronin has not established that the marks are confusingly similar.

Moreover, Ronin has not established that its trade dress is functional. "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Id.* at 1202-03 (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164, 115 S.Ct. 1300, 1304, 131 L.Ed.2d 248 (1995)). "Functional features are by definition those likely to be shared by different producers of the same product and therefore are unlikely to identify a particular producer." *Id.* (citation omitted). Such features are not protected by trademark law because if they were, "competitors would be prevented from duplicating the new product even to the extent permitted by the branches of the law of intellectual property that protect innovation rather than designations of source." *Id.* (citations omitted).

And though it may be difficult to draw the line between what is and is not functional, there are two primary tests to determine functionality. The first test is the traditional test, which determines whether a product feature "is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Id.* at 1203 (quoting *TraFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 32 121 S.Ct. 1255, 1261 (2001) (citation omitted)). The second test is the competitive necessity test, which determines whether "a functional feature is one the exclusive use of which would put competitors at a significant non-reputation-related disadvantage." *Id.* (cleaned up). This test is "generally applied in cases of aesthetic functionality[.]" *Id.*

Ronin's argument is that "all . . . aspects of [Ronin's] style of doing business are nonfunctional, as there are many alternative ways to present the product to the public[.]" (Pl.'s Mot., at 14-15.) But Ronin provides only two other ways in which competitors advertise their bullet antennas online. (*See id.* at 14.) At this stage of the proceedings, the Court cannot conclude that this means that the way in which Ronin markets its bullet antenna is non-functional. As the Defendants note, "[t]he practice of showing products alongside installation photos is functionally necessary." (Defs.' Resp., at 13.) In fact, the Defendants show that because "vehicle antennas mount on the right, requiring left-side product images to demonstrate installation . . . is widely used throughout the industry." (*Id.* (citing ECF No. 33-14.) Thus, Ronin

has not shown that it is likely that the way in which it presents its antennas to the public is nonfunctional.

Moreover, Ronin has not shown that the way in which it packages its antennas is likely functional. As the Defendants note, "the tubular shape of Ronin's packaging is a direct result of the antenna's cylindrical form, and the black coloring with white graphics represents nothing more than an obvious and commonplace design choice for automotive accessories." (*Id.* at 13 (citing Ex. ECF No. 33-1).) Ronin does nothing to rebut this contention—which is notable given that it is Ronin's burden to demonstrate functionality. It has provided no evidence of different ways in which to package an antenna other than a tubular package. Moreover, Ronin takes issue with the Defendants copying its instruction sheet. (Pl.'s Mot., at 14.) Additionally, even if an instruction sheet was non-functional (which the Court doubts), the Defendants have provided specific evidence that the instruction sheet is not the one they use in its packaging. (*See* Defs.' Resp., at 14 (citing ECF No. 33-1 ¶¶ 23-25).) Ronin does nothing to rebut this claim. Therefore, Ronin has not shown that its packaging is likely non-functional.

In sum, Ronin has failed to show it is likely to succeed on all three—or any—of the elements of a trade dress infringement claim.

## C. Copyright Infringement Claim

### 1. Likelihood of Success on the Merits

"To succeed on its claim of copyright infringement, [Ronin] must prove (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1301 (11th Cir. 2020) (cleaned up).

Ronin's copyright infringement claim centers around its image of its bullet antenna in focus (at left), with half of a white truck in the background of the image (at right), as reproduced below.



(Macco Decl. ¶ 4.) As to the first element of a copyright infringement claim, Ronin notes that it has a copyright in the image, registered as U.S. Copyright Registration No. VA-2-395-784, that "was made within five years of the first publication of the image on October 22, 2022." (Pl.'s Mot., at 2, 15.) "A copyright registration proves 'prima facie proof of the existence of a valid copyright.'" *C.B. Fleet Co.*, 510 F. Supp. 2d at 1081 (citation omitted). Therefore, Ronin has established the likelihood of success on the merits of the first element of its copyright infringement claim.[4]

As to the second element (copying), which is Ronin's "burden to prove," there are "two subparts[:] factual and legal copying." *Compulife*, 959 F.3d at 1301 (citation omitted). Factual copying occurs when "the defendant actually used the plaintiff's material." *Id.* (citation omitted). Factual copying may be proved "either by direct evidence" or "inferred from indirect evidence demonstrating that the defendant had access to the copyrighted work and that there are probative similarities between the allegedly infringing work and the copyrighted work." *Id.* at 1301 (citation omitted). The Defendants don't seem to dispute factual copying, instead arguing that "Ronin's copyright protection would extend only to its <u>creative</u> contributions to the composite image—which are minimal." (Defs.' Resp., at 19.) Thus, the Defendants' arguments center around the issue of legal copying.

"Legal—or actionable—copying occurs when those elements of the copyrighted work that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable." *Compulife*, 959 F.3d at 1302 (cleaned up). But "[b]efore comparing two works to determine if they display the required substantial similarity, a court must eliminate from comparison the unprotectable elements of the copyrighted work." *Id.* at 1303 (citation omitted). This process is known as "filtration" and "is necessary because even substantial similarity between a copyrighted work's unprotectable elements and a purportedly infringing work isn't actionable, regardless of how many unprotectable elements are copied or how important they may be." *Id.* (citation omitted).

There are three methods of filtration that are at issue here. First, "some

---

[4] The Defendants state that Ronin's copyright "may be invalid" because "Ronin has not demonstrated that it obtained authorization from the owner of the Ford Raptor truck stock photograph . . . ." (Defs.' Resp., at 19.) But this equivocal statement is insufficient to rebut the presumption of validity.

expression may be so intrinsic to the communication of an idea—or procedure, process, etc.—that it is considered to have merged into the idea. According to the merger doctrine, where there are sufficiently few ways of expressing an idea, not even the expression is protected by copyright." *Id.* at 1304 (cleaned up). Second, "material taken from the public domain is unprotected, even if incorporated into a copyrighted work." *Id.* (citing *Stewart v. Abend*, 495 U.S. 207, 207, 234, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990)). And third, "material may be protected if it constitutes *scenes a faire*—that is incidents, characters, or settings that are indispensable or standard in the treatment of a given topic." *Id.* (cleaned up); *see also Belair v. MGA Entertainment, Inc.*, 831 F.Supp.2d 687, 692 (S.D.N.Y. 2011) ("[U]nder the doctrine of *scenes a faire*, elements of an image that flow naturally and necessarily from the choice of a given concept cannot be claimed as original." (citation omitted)).

Who has the burden on the issue of filtration was discussed in *Compulife.* There, the Eleventh Circuit confirmed that at trial, "after an infringement plaintiff has demonstrated that he holds a valid copyright and that the defendant engaged in factual copying, the *defendant* bears the burden of proving—as part of the filtration analysis—that the elements he copied from a copyrighted work are *unprotectable.*" 959 F.3d at 1305. What is less clear, however, is the burden on a motion for preliminary injunction. For example, in *Compulife*, the Eleventh Circuit cited the following passage from what it referred to as "the foremost copyright treatise," Nimmer on Copyright: "[A]lthough a plaintiff's failure to present proof about merger and *scenes a faire* could defeat a plaintiff's application for a preliminary injunction, it would seem that defendant must go forward at trial with appropriate evidence as to those doctrines." *See id.* (citing 4 Nimmer on Copyright § 13.03[F][3]) (cleaned up)).

The Court need not decide exactly how the burden on filtration operates on a motion for preliminary injunction because (1) the Defendants have introduced filtration evidence that the elements of Ronin's copyrighted image that are protectible are minimal, and (2) Ronin has failed to introduce any evidence whatsoever on this issue. For example, Ronin makes no attempt to argue which elements of its copyrighted image are protectible and which are not. It instead makes the conclusory and overly simplistic argument that because the Defendants copied its image, it infringed its copyright. (*See* Pl.'s Mot., at 16-17.) The Court thus cannot conclude that Ronin is likely to succeed on the merits of its copyright infringement claim.

In fact, the portion of the image that contains a white truck is likely unprotectible. The Defendants note that the image is a stock photograph of a

Ford Truck that it has obtained the license from Ford to use. (Defs.' Resp., at 19.) Ronin uses the same or a similar photograph and seems to have merely blurred out the "Ford" logo from the grill of the truck. (*Id.*) It is thus likely that the photograph of the white truck is a publicly available image and is therefore not protectible. *See Compulife*, 959 F.3d at 1304 ("[M]aterial taken from the public domain is unprotected, even if incorporated into a copyrighted work.") Ronin neither responds to the Defendants' arguments nor attempts to show that the truck in its photo is not publicly available.

Additionally, the use of the bullet antenna in advertisements is, of course, not protectible. As the Defendants' evidence demonstrates, companies selling bullet antennas place bullet antennas in their advertisements. (*See* ECF No. 33-14 (showing various similar advertisements on Amazon).) This shows that advertisements for bullet antennas "naturally and necessarily" include the bullet antenna itself and are thus, at the very least, *scenes a faire* of such advertisements. *See Belair*, 831 F.Supp.2d at 692 (citation omitted). And, as the Court understands Ronin's arguments, Ronin is not disputing that the Defendants may place bullet antennas in their advertisements.

So after this filtration, what the Court is left with is a likely unprotectible bullet antenna placed to the left of a likewise likely unprotectible white truck. This placement is also likely not protectible under copyright law. There are so "few ways of expressing" the idea of a bullet antenna on an automobile—especially in the context of an advertisement for a consumer—that the expression at issue here has "merged into the idea" of a bullet antenna. *See Compulife*, 959 F. 3d at 1304 (citation omitted); *see also* ECF No. 33-14. Similarly, the placement of the bullet antenna and automobile at issue here "flow[s] naturally and necessarily from the choice of a given concept," the concept here being advertising a bullet antenna, and is thus not protected according to the *scenes a faire* doctrine. *Belair*, 831 F.Supp.2d at 692 (citation omitted). Such placement of the antenna and automobile is likely "entirely unoriginal, and therefore unprotectable." *Id.* (citing *Feist*, 499 U.S. at 363, 111 S.Ct. 1282).

In sum, Ronin has failed to show that after filtration, it is likely that there are protectible portions—besides its trademark which, as explained *infra* 3.A.1, it has not established is susceptible to a likelihood of confusion—in its copyrighted image that could lead to copyright infringement. As such, it has failed to show that it is likely to succeed on the merits of its copyright infringement claim.

### 4. Conclusion

Because Ronin has failed to show that it is likely to succeed on any of its

claims, the Court **denies** the Plaintiff's amended motion for preliminary injunction (**ECF No. 32**).

    **Done and ordered** in Miami, Florida, on March 20, 2025.

Robert N. Scola, Jr.
United States District Judge